## Shy v. The State of Ohio.

*Intoxicating liquors—Possession of property designed for man-*
*ufacturing—Presumption of use for illegal purpose—Sale of*
*component parts of still, illegal, when.*

1. The mere possession of articles in a stock of merchandise
   capable of both legitimate and illegitimate use affords
   no presumption of a design or intent upon the part of
   the possessor thereof to use or dispose of the same for
   an illegal purpose.

2. Where, however, such possessor actually designs and intends
   to dispose of such property as component parts of a still
   for the manufacture of intoxicating liquors and knowingly
   offers the same for sale for such purpose, then the posses-
   sion of such articles becomes illegal.

(Decided March 23, 1922.)

Error: Court of Appeals for Clark county.

*Messrs. Zimmerman, Zimmerman & Zimmer-*
*man,* for plaintiff in error .

*Mr. Donald Kirkpatrick,* prosecuting attorney;
*Mr. J. A. White,* and *Mr. Charles M. Earhart,* for
defendant in error.

Kunkle, J.    Plaintiff in error was charged,
tried and convicted of a violation of Section 4, of
the Crabbe Act, namely, Section 6212-16, General
Code.

This section provides that "it shall be unlawful
to have or possess any liquor, or property designed
for the manufacture of liquor, intended for use
in violation of law."

The affidavit charged plaintiff in error with
having in his possession certain property which

was designed for the manufacture of intoxicating liquor for use in violation of law.

The particular facts upon which this action is based can be stated more accurately by quoting portions of the testimony.

The witness, John M. Powell, who is a state prohibition officer, testifies in part as follows, (pages 1, 2, 3, 4 and 5 of the record):

"Q. Did you have any conversation or attempt to buy any of those cans there? A. I went in and inquired about those copper cans and the price of them. And he quoted prices on them ranging from $7.00 up to about $14.00. I told him I did not think they were quite large enough for my purpose. He said he could get them up to 30 gallons if I wanted; that he could order them. But the 30 gallon cans hadn't given satisfaction that the smaller cans of about 10 or 12 gallons had.

"Q. Did you disclose to him your purpose? A. Yes. I told him then I didn't think we could make enough liquor out of the 10 gallons can. He said, 'Oh, yes, you can make probably 2½ gallons of whiskey at a filling.'

"Q. He said what? A. That the larger can would give probably 2½ gallons at one filling—the first cooking.

"Q. Would it reduce considerably on the second cooking? A. I don't know anything about that, whether it is necessary to cook twice or not. After further conversation I said: 'I know a fellow who has a still completed. I am going to see if I can buy that complete. If I can I will; if not I will come back.'

"Q. You say you told him that? A. Yes, I told him, the defendant. We went away and came

back a short time afterwards and drove up in front of the place. We went in. He said, 'You're back.' I said 'Yes.' Then we went into discussion further and finally asked about the small-sized one—what it would make. He said he sold one to a fellow who told him he got a gallon of whiskey out of it at each cooking, and he further stated that he had sold probably 100 in this county, different sizes, and they had all given satisfaction. We finally purchased one, that's there wrapped up, with connections, clamps and top connection for $7.25. I asked him if it would be necessary to just drill a hole in the top to put on a connection. He said 'No, just punch a hole and take a rat-tail file to smooth it off. You can get the coil at Evilsizor's Plumbing shop.' I said, 'well, now, it would be about 10 days before I can get a drink out of this thing.' He said; 'It wouldn't take that long, whenever the corn commences to sprout its ready.' I said 'Do you put yeast in,' He said: 'You can if you wish.' I said: 'I would like to have a drink before that.' He said 'Do you know where the restaurant at 907 West Main Street is?' I said I could find it. He said 'You fellows go down there and tell him I sent you and you can get a drink. I sold him his outfit every time he was knocked off. He has been knocked off twice.' After purchase was made I said: ' How am I going to get this out to my car without being seen?' He said 'I'll wrap it up and nobody will know.' Mr. Burks paid him the money for it.

"Q. Is this (indicating can) the can you purchased? A. Yes, just as it was wrapped.

"Q.  Mr. Shy wrapped it?  A. Mr. Shy wrapped it.

"Q.  The connections, Mr. Powell, what did the defendant say concerning your need of any connection?  A.  The clamps for the lid, we wouldn't need but three.  They use four on the large cans.

"Q.  The connection for coil, he sold that also?  A.  Put that in the can.  They were included in the purchase price of $7.25.

"Q.  This is the can you purchased?  A.  Yes, and these are the three clamps and the connection for the top to connect the coil.

"Q.  Did the defendant tell you how to use the connections?  A.  Yes, he said: 'Just punch a hole and smooth it out with a rat-tail file—wouldn't need any soldering at all.'

"Q.  Did he show you how to attach the clamps on?  A.  He put one of those clamps on another can and showed us how to keep the lid down.

"BY THE COURT:  Where were those put on?  Show me how.  (Mr. Powell demonstrated.)

"Did he show you how to put them on another can?  A.  Yes, sir.  (Demonstrating.)

"Q.  Now, Mr. Powell, these four cans here with the lids you find here—were they in the store?  A.  They were in the store on display along with the one we bought.

"Q.  What price did he fix on this can here, if he did fix a price?  A.  If my recollection is right $14.00—10 gallon can $14.00.

"COURT: Have those large cans clamps on them now or not?

"MR. ZIMMERMAN:  No, Your Honor.

"MR. SPENCER:  These are some they brought along.

"Q. Mr. Powell, here's a 6-gallon can taken from the store. Did you confiscate the clamps? A. I did and put them in the can myself.

"Court: Where were the clamps?

"A. In the window near where the cans were.

"Q. Where were the copper connections that go with them, with the clamps?

"Mr. Zimmerman: What copper connections do you refer to?

"Mr. Spencer: The little brass—

"Mr. Zimmerman: Brass unions.

"Q. Mr. Powell, at the time he sold the copper can there to you men did he understand it was for the purpose of manufacturing whiskey? (Objection by Mr. Zimmerman)

"By the Court: What was said in relation to its use for which you were to put it?

"A. I told him I wanted it to manufacture whiskey, and he explained to me how to operate it to make whiskey.

"Q. What, if anything, did he say about others having purchased these cans?

"A. He said he sold probably 100 and said Whitley had been knocked off twice, arrested, and he had sold him his outfit every time. He also stated he had sold one of them to another man who told him he had gotten one gallon of whiskey out of it at one boiling.

"Q. Did Mr. Shy tell you what amount of whiskey could be made within this can?

"A. Quoting another customer that it would make a gallon.     *     *     *

"Q. As you bought that can and those clamps and that copper union from Mr. Shy you couldn't have manufactured any liquor without drilling a

hole in the top of the can, inserting copper union, and putting on clamps and the coil and having material such as corn—and the fire under it? All those things would be necessary?

"A. Yes, sir."

The witness Clark H. Burks, another state prohibition officer, testified to substantially the same facts as narrated by the witness Powell.

Plaintiff in error gave his version of the transaction. On pages 17 and 18 of the record he admits that Powell and Burks came into his store and wanted to buy a still, but specifically denies many of the statements of Powell and Burks.

On page 23 of the record the following appears:

"Q. Mr. Shy, how many of these cans of different sizes have you sold from your store? (Objection by Mr. Zimmerman. Objection overruled. Exception.)

"THE COURT. Ask him—did you tell Mr. Powell you had sold about a hundred cans? A. Yes, I believe I told Mr. Powell I had sold about a hundred cans. He had asked me how many I had sold, if I had sold many."

. The trial court found plaintiff in error guilty and the question for consideration is whether such finding is supported by the evidence.

In brief the evidence offered by the state tends to show that Powell and Burks stated clearly to plaintiff in error the use for which the articles purchased were intended, and, as above stated, plaintiff in error admits that Powell and Burks wanted to buy a still. Plaintiff in error does not specifically deny that he knew the purpose for which the articles so purchased were intended and

the use to be made thereof. He admits that he had sold about a hundred of these cans.

The witness Powell states that plaintiff in error told him he had sold about a hundred of these cans, and that he explained the satisfaction which they had given and the amount of whiskey that could be made at one boiling. We think the evidence warrants the finding of the trial court that plaintiff in error knew the purpose for which the articles in question were purchased, and that a sale, under the circumstances disclosed by the record, including the statement of plaintiff in error that a hundred such cans had been sold by him, was evidence tending to show that the property then in the possession of plaintiff in error was designed for the unlawful manufacture of intoxicating liquors.

We are at least satisfied that the finding of the trial court is not against the manifest weight of the evidence in this respect. The rule governing reviewing courts in reference to disturbing verdicts upon the weight of the evidence is well stated in the case of *Dean* v. *King, Pennock & King*, 22 Ohio St., 118, at page 134:

"2. Motions for new trials, upon the ground that the verdict is against the weight of the evidence, are addressed to the discretion of the court, and if granted, the judgment will not be disturbed on error unless the case is so strong as to show an abuse of the discretion. 5 Ohio, 245; 13 Ohio St., 115. And if the motion be overruled, a reviewing court should not reverse, unless the verdict (or finding of fact, if the jury be waived) is so clearly unsupported by the weight of the evidence as to indicate some misapprehension, or

mistake, or bias on the part of the jury, or a willful disregard of duty.''

In the case of *Breese* v. *State,* 12 Ohio St., page 146, the same being also a criminal case, the fourth paragraph of the syllabus is:

''A judgment will not be reversed because the verdict is contrary to the evidence, unless it is manifestly so, and the reviewing court will always hesitate to do so where the doubts of its propriety arise out of a conflict in oral testimony.''

It is claimed by counsel for plaintiff in error that the articles mentioned in the affidavit do not constitute a complete still, and, therefore, do not come within the provisions of Section 4 of the Crabbe Act.

It may be conceded that the outfit as purchased from plaintiff in error did not constitute a complete still, and that a coil at least was necessary to constitute a complete still.

From a careful consideration of the briefs filed by counsel we are satisfied both upon reason and authority that it is not necessary for the state to prove, under the provisions of Section 4 of the Crabbe Act, that the particular property sold constituted a complete appliance for the manufacture of intoxicating liquor in order to support a conviction.

To so hold would destroy the enforcement of this section of the Crabbe Act and open the door to all forms of evasion by permitting different individuals to possess and furnish separate portions of such an apparatus.

A number of cases have been cited under statutes forbidding the possession of burglary tools, counterfeit dies, etc.

The courts have uniformly held that in order to secure a conviction under these statutes it is not necessary that the apparatus be complete.

We think these cases apply to the case at bar and sustain the conviction of the trial court.

The Crabbe Act contains a provision to the effect that its provisions shall be liberally construed to promote the purposes of the act. This provision should be given due consideration and courts should not adopt a technical construction which would tend to defeat rather than promote the purposes of the act.

It is also urged that the articles involved in this prosecution were carried in stock by plaintiff in error as a part of a general stock of merchandise and were in common and general use for legitimate purposes.

Certain evidence introduced by plaintiff in error supports this claim of counsel.

This phase of the case presents an interesting and important question.

The mere possession of articles in a stock of merchandise capable of legitimate use would afford no presumption of a design or intent on the part of the possessor of such articles to use or dispose of the same for an illegitimate purpose.

Many merchants honestly and legitimately carry articles which could be used for burglar tools or made a part of an apparatus for the manufacture of intoxicating liquor.

The statute was not designed to interfere with the merchant who conducts a legitimate business and carries in stock and disposes of certain articles designed for legitimate use without knowledge

upon his part that such articles are to be employed for an illegitimate use.

When the state claims that certain articles are possessed for an illegitimate purpose, it is necessary for it to establish such claim by evidence that such possessor actually designed and intended such property to be used for an illegal purpose.

Such construction of the statute will protect the merchant who honestly carries in stock and disposes of articles in legitimate trade and in good faith without knowledge that any illegitimate use is intended.

Such construction imposes upon the state the duty of proving beyond a reasonable doubt that an illegitimate use was contemplated by such possessor of such articles.

Applying the above rule to the evidence in the case at bar we think the evidence offered by the state, when taken in connection with certain admissions of plaintiff in error, supports the judgment of the lower court—at least such judgment is not contrary to the manifest weight of the evidence.

Finding no error in the record which we consider prejudicial to plaintiff in error, the judgment of the lower court will be affirmed.

*Judgment affirmed.*

FERNEDING and ALLREAD, JJ., concur.